Dear Senator Collins:
You have requested our opinion on a series of questions regarding the continuing jurisdiction of the Joint Committee on Legislative Ethics ("Joint Committee"), an ethics investigating committee, and the respective houses of the General Assembly over allegations of ethics law violations that have not been resolved by the end of an election-year session or a term of the General Assembly. Your specific questions are these:
1. After an election-year session of the General Assembly or after a new General Assembly is convened, does the Joint Committee have jurisdiction over alleged ethics law violations regarding legislator conduct that occurred during the term preceding the convening of a new General Assembly?
2. Under these circumstances, if the Joint Committee recommends further investigation, can the presiding officers refer the matter to an investigating committee either before the election or after the convening of a new General Assembly?
3. What legal or prudential considerations restrain a house of a new General Assembly from disciplining or expelling a member for alleged unethical conduct that occurred during a prior term?
Our opinion is as follows: The Joint Committee and ethics investigating committees have continuing jurisdiction over allegations of ethics law violations, even if the conduct occurred during a prior term of the General Assembly. In addition, the respective houses may take some actions to discipline a member for pre-term conduct, including censure. Well-grounded historical practice indicates, however, that a member should not be expelled from a new General Assembly for alleged violations known to the voters at the time that the legislator was reelected.
 I Ethics Committee Jurisdiction
The Joint Committee is a statutory committee with specified duties regarding the administration and enforcement of legislative ethics requirements. See Title 2, Subtitle 7 and Title 15, Subtitle 5, Part II of the State Government ("SG") Article, Maryland Code. The rules of each house, which mirror many of the provisions of the Public Ethics Law, provide that ethics rules and procedures for legislators "are effective both during and between sessions of the General Assembly." Senate Rule 118 and House Rule 117 (1998).[1] In addition, an ethics investigating committee, which could receive a referral from the Joint Committee for "further proceedings" pursuant to SG, § 15-518(d)(3) and the rules of the respective houses, "function[s] during and between sessions throughout each year of the term and until a new investigating committee is created". See also Senate Rule 130 and House Rule 130.[2]
Thus, the Joint Committee does not lose its power to handle or resolve a legislative ethics issue because of the conclusion of an election-year session or the end of a General Assembly term.[3] However, if the Joint Committee is charged with making recommendations for sanctions against a member (or decides to make such recommendations), the full range of sanctions may be precluded by considerations discussed in Part III below.
 II Investigating Committee Jurisdiction
When a complaint triggers an ethics investigation, one course of action open to the Joint Committee is to refer the matter for further proceedings by an investigating committee.[4] An ethics investigating committee continues in existence even after the term of the General Assembly, if the committee is established pursuant to SG, § 15-522(a):
 Each branch of the legislature by a simple resolution shall establish an investigating committee, as provided in Title 2, Subtitle 16 of this article, promptly upon the beginning of the first regular session after each gubernatorial election. Subject to further action of that branch of the legislature, that investigating committee shall function during and between sessions throughout each year of the term and until a new investigating committee is created.
Apparently, it has been the practice of the General Assembly to treat each house's appointments to the Joint Committee on Investigation established under Article III, § 24 of the Maryland Constitution as the functional equivalent of ethics investigating committees specified in SG, § 15-522(a).[5] Although resolutions were not adopted in each house regarding this committee and the committee has a curtailed constitutional jurisdiction, these factors do not, in our view, undermine the power of single-house members of this committee to function as an ethics investigating committee on a matter referred by the Joint Committee. First, the broad authority of the General Assembly to investigate is inherent. 63 Opinions of the Attorney General 453, 454 (1978). Second, Article III, § 24 sets forth the mandatory jurisdiction of the Joint Committee on Investigation, not those functions that the General Assembly, its houses, and its leadership might confer upon the committee. Third, a vote by members on the adoption of each house's rules providing for such a committee might be equated to the adoption of a specific resolution. Fourth, State law makes this committee a "standing committee" with continuing authority to exercise its "usual and customary" jurisdiction when the General Assembly is not in session. See SG, § 2-101(f), 2-1102, and 2-1103.[6]
In short, after an election-year session, if a matter is referred by the Joint Committee on Ethics to the single-house members of the Joint Committee on Investigation, they may conduct that investigation. The same would be true if the referral occurred after a new General Assembly has convened, although it would be a simple matter for the houses to adopt the resolutions contemplated by SG, § 15-522(a) to create ethics investigating committees. This approach, in our view, would remove any doubts and would be the wisest course when a new legislature is convened. After a new term has begun, an investigating committee's recommendations as to sanctions may be limited by the considerations discussed in Part III below.
 III Action by the Respective Houses
More than 100 years ago, the Supreme Court, in upholding certain congressional investigative actions, noted in passing that the United States Senate had acted within its power in expelling a member, despite the fact that his "was not a statutable offense, nor was it committed during the session of Congress, nor at the seat of government," In re Chapman, 166 U.S. 661, 669-70 (1897).See also Joseph Story, Commentaries on the Constitution of theUnited States § 836 (1833) (the power of Congress to discipline members is not qualified as to "the time, place or nature of the offense"). Nevertheless, over the years, Congress has tempered its views on the reach of its expulsion power. Commentators appear to agree that, despite the lack of identified legal constraints on Congress' power, there are at least prudential and policy-based reasons for a legislative body to decline to expel a member for conduct that occurred prior to the member's reelection and that was known to the electorate.
In its report accompanying a resolution to discipline Senator Robert Packwood, the Senate Select Committee on Ethics stated that "[t]here have been indications that the Senate in an expulsion case might not exercise its disciplinary discretion with regard to conduct in which an individual had engaged between the time he or she had been a Member." S. Rep. No. 104-137, 104th Cong., 1st Sess. 40 (Sept. 5, 1995) ("Packwood Report"). A 1993 Congressional Research Report elaborates on the reasons Congress might not expel a member who was reelected after allegations of misconduct had surfaced:
 Although the authority and power of each House of Congress to expel appears to be, as noted by the Supreme Court, at the virtual unbridled discretion of the body, policy considerations, as opposed to questions of power or authority, may have generally restrained the Senate and the House of Representatives in the exercise of their authority to expel (but not necessarily in the exercise of their authority to censure) when the conduct complained of occurred prior to the time the Member was in Congress, or occurred in a prior Congress, when the electorate knew of the conduct and still elected or re-elected the Member. The apparent reticence of the Senate or House to expel a Member for past misconduct after the Member has been duly elected or reelected by the qualified electors of a State, with knowledge of the Member's conduct, appears to reflect the deference traditionally paid in our heritage to the popular will and election choice of the people. The authority to expel would thus be used cautiously when the institution of Congress might be seen as usurping or supplanting its own institutional judgment for the judgment of the electorate as to the character or fitness for office of an individual whom the people have chosen to represent them in Congress.
Maskell, CRS Report for Congress: Expulsion and Censure ActionsTaken by the Full Senate Against Members 8-9 (Sept. 17, 1993) ("CRS Report"). See also Bowman and Bowman, Article I, Section 5:Congress' Power to Expel — An Exercise in Self-Restraint, 29 Syr. L.Rev. 1071, 1101 (1978) ("Despite the lack of any specific restrictions in the language of the expulsion clause itself, and despite the repeated assertions that Congress' discretion is absolute, Congress has demonstrated a clear reluctance to expel when to do so would infringe . . . upon the electoral process. . . .").
This "reluctance," some would argue, is an implicit acknowledgment that it would be unconstitutional for a legislative body to "substitute . . . the electoral standards of the legislature for those of the voters" by expelling a member for misconduct committed prior to his or her reelection. Bowman and Bowman, 29 Syr. L.Rev. at 1082 n. 60. One congressional committee has noted that:
 To exercise such power in that instance the House might abuse its high prerogative, and in our opinion might exceed the just limitations of its constitutional authority by seeking to substitute its standards and ideals for the standards and ideals of the constituency of the member who had deliberately chosen him to be their Representative. The effect of such a policy would tend not to preserve but to undermine and destroy representative government.
Report of the House Judiciary Committee, H.R. Rep No. 570, 63rd Cong., 2d Sess. See also Bowman and Bowman, 29 Syr. L.Rev. at 1102 ("The question of whether Congress has the power to expel a member for misconduct prior to his election or reelection has exercised Congress on several occasions, but has never, in fact, led to expulsion. The prevailing view is that Congress does not possess the power to expel in these circumstances.").[7]
On the other hand, some of these same authorities do not question the power of a legislative body to discipline a member by censure, rather than expulsion, for pre-term conduct. See PackwoodReport at 40 ("Historically, neither House of Congress has abdicated its authority to punish a Member in the form of censure for conduct which occurred in a Congress prior to a Member's re-election to the current Congress."); CRS Report at 8 and 15.
The Maryland General Assembly's powers to discipline or expel members is both broader and narrower than the authority conferred on Congress by the federal Constitution. Unlike Congress, the General Assembly by statute can add additional qualifications to the offices of delegates and senators. Under Article III, § 19 of the Maryland Constitution, "Each House shall be the judge of the qualifications and election of its members, as prescribed by the Constitution and Laws of the State. . . ."[8] Nevertheless, the respective houses of the General Assembly are expressly barred from expelling a member a second time for the same offense. The reason underlying this prohibition is the idea that "once the voters have had an opportunity to pass judgment on a former member's conduct, their will is supreme." See Letter of Advice from Assistant Attorney General Richard E. Israel to Delegate Robert L. Flanagan (January 19, 1998). This same concern has marked Congress' reluctance to expel a reelected member for conduct occurring in a prior term.
Although no court has held that it would be unconstitutional to expel a member for pre-term conduct, and although expulsion under these circumstances is not expressly barred by the text of the Maryland Constitution, it is our view that it would be a legitimate exercise of discretion, soundly supported by the practice of the U.S. Congress, for the respective houses to decline to expel a member for conduct known to the voters and occurring before his or her reelection to the General Assembly. Similarly, it would be an entirely permissible decision for the Joint Committee on Legislative Ethics or an ethics investigating committee to decline to recommend expulsion as a sanction for a reelected legislator.[9] Nevertheless the availability of other sanctions — particularly censure — would not be affected by a member's reelection. In short, the respective houses may take some action to discipline a member for pre-term conduct, including censure.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Robert A. Zarnoch Assistant Attorney General
___________________ Jack Schwartz Chief Counsel Opinions Advice
[1] This provision is contrary to the usual practice, under which legislative rules ordinarily expire at the end of each session. Mason's Manual of Legislative Procedure 21-24 (1989).
[2] An investigating committee referral under theseprovisions occurs only when a complaint — that is, "a written statement" — is filed or prepared alleging charges against a member. SG, § 15-515. Of course, even in the absence of a complaint, the Joint Committee may obtain jurisdiction over a legislative ethics issue through other devices, such as referral from the leadership, SG, § 2-706(5) and 2-708, or issuance of an advisory opinion, SG, § 15-514(a). This jurisdiction too would be unaffected by the end of an election-year session or the conclusion of a General Assembly term. 
[3] Because Joint Committee vacancies occurring after an election are invariably filled the first day of a new session, there would never be a gap where the Committee had insufficient members to function.
[4] Although SG, § 15-520 and 15-521(c) do not expressly state how a Joint Committee recommendation for "further proceedings" transfers the matter to an investigating committee, Rule 128(d) of the House and Rule 128(d) of the Senate require the presiding officer to make a referral to an ethics investigating committee.
[5] Article III, § 24 states in relevant part that:
 [W]ith a view to the more certain prevention, or correction of the abuses in the expenditures of the money of the State, the General Assembly shall create, at every session thereof, a Joint Standing Committee of the Senate and House of Delegates, who shall have power to send for persons, and examine them on oath, and call for Public, or Official Papers and Records, and whose duty it shall be to examine and report upon all contracts made for printing stationery, and purchases for the Public offices, and the Library, and all expenditures therein, and upon all matters of alleged abuse in expenditures, to which their attention may be called by Resolution of either House of the General Assembly.
[6] Even if the Joint Committee on Investigations, functioning as an ethics investigating committee, did not have the subpoena power authorized by SG, § 15-521(c), it could be given the power as a standing committee, with the approval of the Legislative Policy Committee.See SG, § 2-1104.
[7] The Bowmans also note the voter's power to "forgive" a legislator's misconduct at the polls:
 A prohibition against expulsion for misconduct occurring prior to election or against the exclusion of a member re-elected after expulsion seems implicit in the structure of the Constitution. To allow Congress to expel for a prior act in the face of the expressed will of the electorate would, in effect, permit Congress to impose qualifications for elected representatives in addition to those of age, residency, and citizenship enumerated in the Constitution and thus to substitute its judgment as to who should represent a state or district for that of the voters themselves.
See Bowman v. Bowman, 29 Syr. L.Rev. at 1104.
[8] The full text of Article III, § 19 of the Maryland Constitution is as follows:
 Each House shall be judge of the qualifications and elections of its members, as prescribed by the Constitution and Laws of the State, and shall appoint its own officers, determine the rules of its own proceedings, punish a member for disorderly or disrespectful behavior and with the consent of two-thirds of its whole number of members elected, expel a member; but no member shall be expelled a second time for the same offence.
By contrast, Article I, § 5 of the U.S. Constitution provides in relevant part, as follows: "Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a Member."
[9] One form of discipline not controlled by either constitutional considerations or custom or practice is the presiding officers' power to remove a member from a committee or reassign the legislator to another committee. Because of the link between service on a committee and effective representation, however, the presiding officers could conclude that the severe sanction of a loss of all committee memberships should not be imposed on a reelected legislator.
 *Page 109